Good morning, may it please the court, Ben Brodsky on behalf of the appellant SBFA, I've reserved three minutes for rebuttal. This appeal concerns the constitutionality of California regulations that mandate a one-size-fits-all set of disclosures across a wide range of commercial financing products, including the two products that are at issue in this appeal, sales-based financing and open-end credit. The district court erred in entering summary judgment against appellant SBFA on its First Amendment claim and in applying the relaxed Zadower standard to SBFA's claim that these regulations violated their First Amendment rights or their members' First Amendment rights by requiring those members to describe their products in ways that are literally false, misleading, and require the members of SBFA to take a controversial position that is contrary to their interests, both subjectively and objectively controversial. The deferential Zadower standard applies to compelled commercial speech only when that speech is purely factual and uncontroversial. Below... I'm struggling to understand why this is not purely factual. Sure, so let's deal with the disclosures with respect to sales-based financing. So in sales-based financing, the provider of financing purchases the right to collect a percentage of a business's receipts up to a sum certain. I pay business $10,000. I get the right to collect 5% of their receipts on a weekly basis until I collect $15,000. But it is not a fixed right. It is a contingent right because if the business shuts down, burns down in a fire, the proprietor dies, the giver of the financing has no right to collect that $15,000. It's purely contingent on the generation of receipts by the business. Now let's look at what the disclosures make a provider of sales-based financing tell its customers. In section 914A3D, the disclosure requires the provider to say the cost of this financing is based upon fees charged by financer rather than interest that accrues over time. Why is that statement literally false? There is no fee in sales-based financing. The provider is buying the right to collect a certain amount of receipts. The spread between the price that the business receives and the amount of receipts... Counsel, isn't that just semantics? We're talking about a cost to the consumer. Isn't that what we're talking about here? It's absolutely not semantics because it goes to the heart of the product. This is a contingent financial arrangement. It's not a fixed financial arrangement like a loan. And by making my client's members tell their customers the spread between what I might collect and what you're receiving as a fee fundamentally misdescribes the product. It must be purely factual, not mostly factual, kind of factual if you squint your eyes. It has to be exactly what's being disclosed must exactly represent the facts on the ground. And that's just simply not true as to these regulations. Number two, the finance charge. The finance charge will not increase if you take longer to pay what you owe. And relatedly, in the prepayment section, providers of sales-based financing must state that the finance charge will not charge if the payment comes faster than required. That's section 914A4 and 914A10. Why is that not purely factual? Why is it a percentage of receipts and it could take a day or it could take a million years before the provider of financing gets its money back? And it may never. There is no fixed period of time to say it's faster or slower. That's not what this product is. It's not a loan with an amortization schedule. Again, when you obscure the value proposition for sales-based financing, the government may think, it doesn't really matter to me. It's close. But they're making my clients say their words. And that's why it needs to be exact. Otherwise... But you did suggest some alternative words, which it seems to me is even more confusing than the words that were used to describe it. So to me, getting back to Judge Mendoza's question about semantics, there are alternative ways to do it. And your proposed alternative ways to describe it isn't any better. And in fact, I think it creates additional problems. Well, I guess to that point, Your Honor, I could think of ways I think are clear to describe this. But simply because there is no clear way to describe this doesn't obviate the government's obligation to honor my client's First Amendment rights. Basically what they say in the brief is this is all very confusing to everybody. So we're going to just do the best we can and that's what we're going to do. If the government wants to put its own publication out and say what they, to potential consumers of sales-based financing and say this is what it is, that's their prerogative. But if they want my clients to say it, it has to be purely factual falsity in the context of open-end credit. In open-end credit, the way these disclosures work is there's an assumption that's baked into the disclosures. Basically that the borrower of open-end credit is going to take the full amount of the financing up front and pay it off on a fixed basis. Because that never happens in practice, or at least it doesn't happen in practice. But what does not say estimated is the APR number. That is literally false. There is an estimated APR, but there is not an actual APR. So what ends up happening? Providers of open-end credit must present the most expensive version of their product and they must say this is the APR of my product. It's not. It's an estimated APR. That is literally false. The government, if they're going to make people talk, need to be precise. In addition to being literally false, there was ample evidence in the record that at least created an issue of fact of whether the required disclosures were misleading. There was an expert report prepared by Dr. Kingsley, who is renowned in her area, showing that customers of sales-based financing, or at least prospective customers of sales-based financing, based on her sample, were grievously misinformed and misunderstood what they were seeing. The district court erroneously threw that expert opinion to the side without excluding it and afforded it zero weight, and we've cited in our papers the cases that say that is not proper. The court needs to hear the evidence at a trial, with the benefit of examination and cross-examination, and then make that determination. Notably, the district court did not exclude her opinion. It merely afforded it a weight of zero. That was error. In addition, the district court erroneously relied on another survey called Browsing to Borrow, which became the hook upon which the DFPI hung all of its arguments. Okay, Browsing to Borrow was a 42-person online focus group that said expressly in it, and this is on volume four, page 613 of the record, it is important to note that focus groups are designed to gather insights, not to measure incidents. Results should not be interpreted numerically or otherwise generalized to the wider population of small businesses. Could there be a more glaring disclaimer that this is not reliable to make broader conclusions about what a proper disclosure would be? And that Browsing to Borrow federal reserve study carried the water for the entire argument and basically the entirety of the district court's opinion. That was error. At a minimum, there were competing surveys. SBFA would say that the Browsing to Borrow survey is not worth much at all, but certainly there was a way. In addition, there was evidence in the record of customer confusion. What the district court said as well, there's only 34 people. 34 people is not enough to create an issue of fact. Okay, 30 people makes the difference between something that's conclusive versus something that's worth nothing at all. That was an issue of material fact that was just entirely glossed over. In addition, there was evidence in the record that these disclosures were highly misleading because the estimates that were created, which were a function of a government prescribed methodology, almost never were right. I mean, there were variances of 50, 60, and 70% between the actual performance of these products and what the estimates were on the disclosure. And at a certain point in time, if you're going to hand something to a consumer which is government sanctioned and say, these are the estimates, and they're so wrong as to be almost worthless, that's an issue of fact as to whether they're misleading. Simply put, and the evidence is undisputed, DFPI did no research into these regulations, whether they were effective, whether they matched the way they worked in practice, whether even consumers needed these. They just simply had an idea that they wanted to follow through, and then they jammed it down the throats of people who resisted and didn't want it. I'm going to just quickly address the issue of controversiality. There was evidence in the record below that these regulations are both objectively and subjectively controversial. They're objectively controversial because these products do not have a rate. They do not have a term. They are not a loan. But by requiring the members of SBFA and commercial finances providers generally to say, my product has a rate, my product has a term, you're really forcing us to take a position that's directly contrary to the way we view the product and the way it actually works in practice. Your Honor, I will now stand down because I'm eating into my rebuttal time. Thank you for your attention. Good morning, and may it please the Court. My name is Douglas Beteta. I'm with my co-counsel, Rachel Yu. We represent Defendant Ape Lee Clothilda Hewlett in her capacity as the Commissioner of the Department of Financial Protection and Innovation, which I'll refer to in my argument too as the Department. Following the legislative mandate of California Financial Code Section 22802, the Department crafted regulations that require lenders to provide at the outset of the transaction a short one to two-page disclosure with factual information about their products to help small businesses understand what they're getting into. Where lenders often use varying terminology, the regulations require commonly used financial terms. Where the lenders sometimes hide the cost of their financing, the regulations require an upfront disclosure of the total cost of the financing. As applied to sales-based financing and open-ended credit, the disclosures require purely factual, non-controversial, and are not unjustified or unduly burdensome. Counsel, your friend on the other side has just mentioned at least three or four different, in his view, points of contention that are factual, that there are factual disputes still at issue. Why isn't he right? Your Honor, I believe my colleague stated first various points were SBFA believes that the disclosures are literally false. I believe, I'm sorry, those are just semantic distinctions. They don't make a difference as to what the disclosures mean. As the record shows, the terms they use and the terms the nationwide admin be owing, where the ninth circuit consider a disclosure, difference between owe and do, and between the other words that the SBFA posits, just don't make a difference. What about his argument on the APR that that's literally false? My understanding of the argument on the APR that being literally false is that once their product doesn't have an interest rate, but the statement in the disclosures make clear that APR is not an interest rate. Instead, it is a statement, it's a calculation of an annualized cost of the financing expressed as a yearly rate. Sales-based financing has an annual cost, and the state of California has chosen APR as the way to show that to borrowers in a way that they'll understand, and in a way that they're familiar with. APR is a familiar term that's been used since 1968. Yeah, I mean, you know, when you talk about fees, costs, charges, there are different synonyms that can be used, and I think one way to think about this is to the extent there's some confusion on the consumer's part, then perhaps that's owing to the financial literacy or familiarity with a lot of these products, which can get very complicated, even for sophisticated users. But my question for you is, at what point does the record then create questions of fact that should go to the jury? Counsel did talk about the survey, and I think there was a CEO of one particular company who talked about, or gave some testimony about the information creating some confusion. How should we think about that issue to the extent that they have put some expert testimony into the record? Your Honor, Dr. Kingsley's report does not create a genuine issue of material fact. One fundamental problem with Dr. Kingsley's survey is that it's essentially a test, and it only tells us what the respondents got wrong, not why they got it wrong. These financial concepts are not easy to understand. Just because the disclosures are capable of being misunderstood doesn't mean that they're misleading. That's the point of a control group, to be able to isolate what causes confusion, but failing to keep anything constant between the control group and the test group. Dr. Kingsley's survey cannot say why the respondents are misunderstanding. Hold on, but to Judge Nguyen's point, or point of the question, which is, isn't that creating this material issue of fact that we have to perhaps send back and let ultimately a jury decide? The inference that would create an issue of material fact is whether the survey supports an inference that the disclosures are misleading. But it doesn't, because it presents the results that respondents didn't answer questions about self-based financing when they saw a disclosure about self-based financing that weren't as high as Dr. Kingsley thought it should be. But we don't know why that is. We don't know if that's because of the disclosures, or as Dr. Kingsley herself stated, because closed-end financing is the least complex and most familiar financing features. That's at 3ER377, paragraph 16. The survey just doesn't support an inference that disclosures are misleading, because there's no control group that would show that without the disclosures, consumers would actually understand the self-based financing better, that disclosures don't help them understand self-based financing. Well, that's not the test, though, that in the absence of disclosure, whether they would understand it better, right? The question is focusing on the disclosures and assessing whether it's literally true or, on the whole, misleading in order for the lower-thrower test to apply. Right, exactly, Your Honor. And that's why Dr. Kingsley's survey doesn't help. In the first paragraph of her survey states, this research evaluates the disclosures' effectiveness as measured by the level to which small business owners understand the features of three different financing options, and when those options are presented using the disclosures. It's testing effectiveness. It's not testing whether the disclosures are misleading, confusing, or factually true. It's just testing whether when consumers see the disclosures, are they understanding them? If they're not understanding them, we don't know why. We don't know if it's because the disclosures are being misleading, or because this financing is just more complex, and they're just getting things wrong, because this financing is hard to understand. I believe, Your Honor, you also mentioned the issue concerning evidence of complaints, consumer complaints, that's in the record. Those consumer complaints also don't create a genuine issue from material fact. First, the 34 complaints were made to a single SBFA member where no other members identified any such complaints. This is particularly true where just one of SBFA's members has entered into some 950 financing contracts since the regulations went into effect. That's just one of 15 members. Moreover, although referencing 34 complaints, the hearsay evidence SBFA relies on discusses only four actual complaints, and those complaints don't support a reasonable inference of consumer confusion arising from the disclosures. Two of the complaints about APR, but the APR disclosure is not misleading. It explicitly states that APR is not an interest rate. A third complaint was that no matter how many times we explained what the California form was, and how the forward financing contract had the correct terms, but as forward financing CEO emphasized during his deposition, this doesn't say anything about that the California form was wrong. They were just telling the customer that they should focus on the contract because it has the correct terms. Finally, a broker complained that the payment amount on a forward financing disclosure form did not match the contract, but other funding providers don't do the disclosure forms in the same way, i.e., their forms actually match the contract. So without having the actual disclosure, we don't know if the forward financing company completed the form accurately or if there's some other problem with the form. The evidence simply doesn't create a genuine dispute of material fact about consumer confusion arising from the disclosures. I would like to also address SBFA's point concerning the actual results of the financing, the discrepancy that they point to between what the disclosures estimate and how at the end of the term they are wrong with the evidence provided 60% of the time. Those also don't create a genuine issue of material fact because the disclosures do not lead potential borrowers in the wrong direction. Instead, they lead borrowers to a better understanding of the financing they are considering. The context of the disclosures must be kept in mind. The disclosures are made at the outset of the transaction and are meant to be used at the beginning, not at the end of the transaction. They are based on historical revenue data from potential borrowers used by the financing provider to estimate how the financial transaction will play out. This one- to two-page disclosures describe key terms of the transaction to provide an overview of total cost. The disclosures explicitly state that the estimates are based on disclosed revenue assumptions and actual results may vary. Outside of the disclosures, in the many pages of documents that lenders provide, they can state anything they want, including that under the right circumstances, the borrower's payments can be adjusted if the unexpected happen. Your Honor, the disclosures are not meant to predict the future. No one can do that, and more importantly, the First Amendment doesn't require it. Thank you. Thank you. We've got a little rebuttal time, Counsel. The first thing I want to emphasize is the Court's not sitting here to determine the constitutionality of the regulations. The Court's to determine whether there was an issue of fact, which should have resulted in a full trial and a full record for the Court, then perhaps to make that decision. Number two, to Judge Mendoza's point, I don't think my opposing counsel addressed your point about the APR, which is in the context of the line of credit, the actual versus estimated. Just for the Court's reference, that's 914A4, when there's an actual APR that needs to be disclosed, when in fact it is an estimate, and therefore that is literally false. As to the issue of Dr. Kingsley and her report, what I heard in the argument sounded like what would be an argument after all the evidence was presented with respect to the weight that should be applied, as opposed to whether that survey is entitled to no weight whatsoever. Dr. Kingsley would have testified, and that shows in the record below, that the control she used was in fact the exact perfect control to be used because it kept all variables constant by testing whether someone who was reading one disclosure based on the control and the other, and measuring whether they can accurately answer questions. And the evidence was that the providers of sales-based financing line of credit could not accurately answer questions based on those two controls. That requires testimony from Dr. Kingsley so that she can explain the criticisms that have been leveled against the survey by DFPI, but certainly not to say that it's entitled to no weight whatsoever. As to the issue of, there was one provider of sales-based financing who proffered evidence with respect to customer confusion. Again, that would be a question of weight as opposed to whether it's entitled to no regard at all in creating an issue of material fact. The evidence below perhaps would explain why some other members don't keep records of customer confusion, or whatever the case may be. But that's weighing the weight of that evidence. As to the point of semantics, again, from SBFA's perspective, the meaning of words matter, and they matter so much in this context. It's so critical that the government gets it right when they make somebody say something. And so, simply saying, it's just a little bit off, doesn't really quite perfectly describe it, it's basically there, that's not enough. Purely factual, that's the standard. Thank you. Thank you, counsel, to both sides for your argument. The matter is submitted.
judges: TASHIMA, NGUYEN, MENDOZA